Erwin E. HASSEN and Estate of Birdie B. Hassen, Deceased, Nathan Hassen, Administrator, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 77–2298.

United States Court of Appeals, Ninth Circuit.

June 25, 1979.

Richard K. Seltzer, of Hahn, Cazier, Hoegh & Leff, Los Angeles, Cal., for appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, App. Section, Gary R. Allen and John G. Manning, Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before GOODWIN and ANDERSON, Circuit Judges, and FERGUSON,* District Judge.

FERGUSON, District Judge:

This is an appeal from a decision of the United States Tax Court which held that appellants' claimed deduction of a loss of $477,825.44 was barred by Section 267(a)(1) of the Internal Revenue Code. We hold that the tax court properly disallowed the loss. 63 T.C. 175 (1974).

*FACTS*

The facts are not in dispute. The parties stipulated to them in the tax court and they are, in relevant part, set forth below.

On March 18, 1955, Erwin E. Hassen and Birdie B. Hassen (the "Hassens") purchased Golden State Hospital ("Golden State") for $975,000. Although the property was a community asset, title to the property was taken in the name of Birdie B. Hassen. Subsequent to 1955, Mr. Hassen borrowed money from his sister, Betty Stein, and Mrs. Hassen as the nominal owner of the property executed a note and trust deed pledging Golden State to secure the loan. In 1958 Betty Stein transferred the note and trust deed to Pacific Thrift and Loan Company ("Pacific Thrift") as an accommodation to Mr. Hassen in connection with his sale in

* The Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1958 of shares of stock of Pacific Thrift. Mr. Hassen did not own any interest in Pacific Thrift after 1958.

Commencing in 1960, Pacific Thrift exerted pressure on the Hassens to make payments on the note which was in default and threatened foreclosure. In November 1960, Pacific Thrift served a notice of foreclosure pursuant to its power of sale upon the Hassens pursuant to state law. The Hassens who had been seeking financing to cure the default, were able to obtain several extensions. In May 1961, Pacific Thrift was forced to foreclose by virtue of the pressure exerted on it by the California Corporations Commission. The trustee's sale took place on May 31, 1961, and Pacific Thrift was the only bidder, purchasing Golden State for $46,300 which amount was equal to the outstanding balance of the note. Pacific Thrift acquired legal title to Golden State as of May 31, 1961 at a trustee's sale pursuant to its exercise of the power of sale in its trust deed. The Hassens' adjusted basis on Golden State on May 31, 1961 was $524,125.44.

During a discussion between Mr. Hassen and Mr. Beidner, an officer of Pacific Thrift, a few days prior to May 31, 1961, Mr. Beidner stated that if Mr. Hassen did not cure the default and it became necessary to foreclose, and if Pacific Thrift bought Golden State at the trustee's sale, Pacific Thrift would give Mr. Hassen or an entity specified by him the right to purchase Golden State from Pacific Thrift for the amount outstanding on the defaulted note plus foreclosure costs. That right to purchase was contingent upon Mr. Hassen's ability to borrow the purchase price within 90 days of the trustee sale.

On June 5, 1961, U.L.C. Corporation ("U.L.C.") and Pacific Thrift entered into an escrow agreement which permitted U.L.C. to purchase Golden State if it could obtain financing. The purchase price set forth in the escrow instructions was $70,000, which amount equaled the amount outstanding of the defaulted note and the cost incurred by Pacific Thrift on the foreclosure. On August 30, 1961, the sale was consumated and Pacific Thrift conveyed the legal title on Golden State by grant deed to U.L.C. Corporation. At all times here material, all of the shares of U.L.C. were owned by the Hassens, their daughters, their brothers and their sisters.

The taxpayers reported this loss in 1961 and claimed a deduction for it in 1962. The Commissioner of Internal Revenue disallowed this deduction and taxpayers filed a petition with the tax court for a redetermination. The tax court held that the loss claimed by taxpayers was disallowed by § 267(a)(1) and the taxpayers filed this appeal.

## DISCUSSION

■ Appellants claim that the tax court's decision is erroneous because:

(1) § 267(a)(1) is inapplicable because the sale was neither direct nor indirect; in "step transactions," there must be a binding commitment to take all steps; and

(2) § 267(a)(1) applies only to voluntary sales and the sale here was involuntary.

Section 267(a)(1) [1] disallows deductions when there has been no genuine economic loss. As the Fifth Circuit discussed in *Fender v. United States*, 577 F.2d 934, 936 (5th Cir. 1978), Treasury Regulation § 1.165–1(b) provides that "[o]nly a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."

1. Sec. 267. Losses, expenses, and interest with respect to transactions between related taxpayers.
  (a) Deductions disallowed.—No deduction shall be allowed—
    (1) Losses.—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).
  Paragraph (2) of subsection (b) is the one relevant to this case:
    (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

Here appellants sought to deduct a loss from the sale of an asset while they retained substantial control of the asset. Appellants faced foreclosure on the property and chose to arrange repurchase of the property by a corporation owned by them. They now assert that by this action they suffered a loss of basis which, if the property is resold in the future, will adversely affect their tax liability. Any loss of basis does not, however, render § 267(a)(1) inapplicable. The property remains undiminished and within the control of the appellants; there has been no real loss. Appellants' argument about "indirect" and "involuntary" sales does not alter this central fact.

(1) Indirect Sales

The parties agree that taxpayers and Pacific Thrift discussed and agreed prior to the foreclosure sale that Pacific Thrift would purchase the hospital and then sell it to U.L.C., a corporation more than 50%-owned by taxpayers. Taxpayers-appellants contend that their interest in the hospital was not continuous and uninterrupted because Pacific Thrift was not bound by its promise to resell to taxpayers. In addition, appellants claim that application of § 267 here would be unjust since, in their opinion, had they bought the property directly rather than through the corporation, they could have deducted the full amount.

■ The tax court addressed these contentions. The court noted that to require binding commitment between steps would in effect narrow the statute's application to direct sales only. The essential requirement for an indirect sale under § 267 is as the tax court stated: "the sale by one person and the purchase by another are so related to one another that the seller does not realize a *genuine economic loss.*" 63 T.C. at 190 (emphasis added).

The tax court relied on *McWilliams v. Commissioner,* 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947). In that case, the taxpayer-husband sold stock to an intermediary who, by prearrangement, then sold the stock to the taxpayer-wife. The Supreme Court recognized the presence of the intermediary (persons buying through the stock exchange) and the interval of time between ownership by the husband and ownership by the wife but found that § 24(b), the predecessor to § 267(a)(1), applied to this situation and the intra-family "loss" should be disallowed.

Appellants contend that *Commissioner v. Gordon,* 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968) and *American Bantam Car Co.,* 11 T.C. 397 (1948), aff'd, 177 F.2d 513 (3d Cir. 1940), *cert. denied,* 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950) show that an indirect sale can be found only if there was a binding commitment by Pacific Thrift to resell the hospital to them. Those cases discuss the situation where a series of steps is said to comprise one transaction and the courts held that there had to be a binding commitment to take all the steps. The tax court did not find these cases controlling and held that for an indirect sale to occur within the meaning of § 267(a)(1), there need not be "a single integrated transaction which transfers property between specified persons." 63 T.C. at 190.

■ The tax court's holding is consistent with the language of § 267(a)(1). The statute simply provides that loss from "indirect sales" cannot be deducted. Neither the language itself nor the legislative history suggests that all the stages of the indirect route from taxpayer back to taxpayer's corporation or family member had to be under a binding commitment. If Pacific Thrift had not sold to U.L.C., none of this would be at issue. But it did in fact sell and U.L.C. is owned by the taxpayers; the hospital has passed indirectly from taxpayers to taxpayers' corporation. The mechanics of the transaction should not divert attention from the fact that taxpayers have not sustained any genuine loss in the asset.

Appellants also cite *McNeill v. Commissioner,* 251 F.2d 863 (4th Cir. 1958), *cert. denied,* 358 U.S. 825, 79 S.Ct. 43, 3 L.Ed.2d 65 (1958) and *McCarty v. Cripe,* 201 F.2d 679 (7th Cir. 1953) as cases in which courts found that possession by an intermediate

party rendered § 267 inapplicable. In *McNeill*, the taxpayer's land was seized and held by state tax authorities for nonpayment for six years at which time it was sold to a corporation controlled by the taxpayers. In *McCarty*, the sheriff held a public auction of the taxpayer's farm and, after receiving twenty-five bids, sold the farm to a man who subsequently sold it to a corporation more than 50%-owned by the taxpayer. The court in *McCarty* specifically noted that there was not the "slightest indication of any 'prearrangement' " between the taxpayer, his corporation or anyone else. Because in both cases, unlike here, there was no "prearrangement," the tax court refused to follow them.

In *Fender*, 577 F.2d 934, *supra*, the Fifth Circuit addressed the issue of intermediary possession. Section 267(a)(1), (b)(2) did not apply in that case but the court had to decide whether there had been a bona fide loss. There the taxpayers sold certain bonds to a bank and then 42 days later repurchased them. The court found that although there had been no agreement for repurchase, the taxpayers had "sufficient dominion" over the bank to ensure repurchase.

Here there was a prearrangement for repurchase. The escrow agreement between Pacific Thrift and U.L.C. was executed just five days after the sale to Pacific Thrift. Taxpayers arranged for repurchase and were successful in their efforts to retain control of the property.

(2) Involuntary Sale

■ Appellants also base their argument that § 267 does not apply to involuntary sales on the *McWilliams* and *McCarty* cases. These cases and the legislative history of § 267 may have focused on preventing taxpayers from voluntarily choosing the time for sustaining loss but that "does not alter the broad sweep of the language . . . which outlines a far more general coverage." *Merritt v. Commissioner*, 400 F.2d 417, 420 (5th Cir. 1968). That case specifically held that § 267 applies to involuntary sales:

The Supreme Court in *McWilliams* refused to be diverted into the niceties of either sequence of title or voluntary versus involuntary sales. Instead, the Court recognized that Congress sought to regulate these transfers "independent of the manner in which an intra-group transfer was accomplished" and thereby to preclude all tax losses from sales of property directly or indirectly between members of a family. The corollary readily follows that Section 267 is not to be aborted by engrafting the words "voluntary" and "non-conduit" on the present sales terminology. (footnote omitted) *Id.*

Appellants seek to distinguish the *Merritt* case and argue that while the IRS had seized the taxpayer's stock, the taxpayer was still the owner when the IRS sold it to the taxpayer's wife. Nevertheless, the actions taken by the IRS had forced the sale and the clear language of *Merritt* stands.

The central question is whether appellants have suffered a genuine economic loss. This is determined without reference to whether or not the sale was voluntary or involuntary. Intent or motive to create the loss and to take advantage of it is not a prerequisite.

Section 267 disallows claimed losses when there has been only a shuffling of the asset from one entity to another entity with near-identity of economic interest. To claim a loss, there must be an "economically genuine realization of loss." *McWilliams, supra.* Appellants did not suffer such loss when the property was sold and repurchased. The tax court correctly ruled that § 267(a)(1) disallows their deduction.

AFFIRMED.